Ranney, J.,
delivered the opinion of the court.
The questions presented in this case arise upon a bill of exceptions taken to the instructions of the court below, given to the jury on the trial. Only so much of the evidence as is necessary to show the pertinency of those instructions, is before us. The plaintiff below was in the employ of the defendant, as a brakesman on one of their trains, and was very seriously and permanently injured by a collision between the train and a locomotive, also belonging to the defendant. He gave evidence tending to prove that the injury was occasioned without his fault, through the negligence and carelessness of the conductor of the train; the plaintiff at the time, by the rules and regulations of the company, being subject to the orders of said conductor. He also gave evidence, to show that the injury was caused by the negligence and carelessness of the superintendent of the *road, to whose orders, by the regulations of the [203 company, he, as well as the conductor was subject at the time of the injury. The defendant’s counsel prayed the court to instruct the jury, that neither state of the facts would entitle the plaintiff to re *204 cover, provided the company had placed in these positions, persons of competent care and skill. But the court refused the instruction, and did charge the jury, that, if they were satisfied, from the evidence, that the injury to the plaintiff was occasioned by the negligence or carelessness of either the conductor or superintendent, under whose control he was placed by the company, and acting at the time, and without his fault, he was entitled to recover such damages as would compensate him for the injury. Under this instruction, the jury-returned a verdict for the plaintiff for $6,050, upon which, after overruling a motion for a new trial, the court entered a judgment.
It is not denied by counsel for the plaintiff in error, that the charge of the court below was in strict accordance with the-holding of the late court in bank in the case of the Little Miami Railroad Co. v. Stevens, 20 Ohio, 415. In that case, as in this, it was left in doubt whether the negligence complained of, and upon which the jury found their verdict, was that of the superintendent or conductor. In this case, as in that, it is necessary to find the company liable for the negligence or carelessness of both the superintendent and conductor, before the judgment can be affirmed, as the instruction covered both, and it can not now be told upon which the carelessness and negligence was fixed by the evidence. But whether upon the one or the other, we must assume that the plaintiff below, in accordance,with the rules of the company, was acting under his orders and control at the time he received the injury. We assume, therefore, as most favorable to the defendants below, that the negligence was that of the conductor. In the case cited, it was held that where an employer places one person in his employ under the direction of another also in his employ, such employer is liable for injury 204] to the person placed in the ^subordinate position, by the negligence of his superior. And in the application of this principle to the case under consideration, it was held that the railroad company, having placed the engineer in their employ under ,the control of the conductor, who directed when the cars were to start, stop, etc., was liable to the engineer for any injury received b'y him occasioned by the negligence of the conductor, while they were both engaged in their respective employments. The correctness of that decision is denied; and, as it was made by a divided court, and is claimed to be in conflict with several cases decided elsewhere by courts of acknowledged learning and ability, we have very carefully and *205 cheerfully examined the grounds upon which it was placed, with the full confidence that the able counsel engaged in this case have brought to our attention every consideration necessary to the full understanding of the question; and I am now instructed to declare, as the unanimous opinion of this court, that the law was then correctly administered, and the rule laid down, such as meets our unqualified approval.
I shall take no time to prove that this corporation, and every other prosecuting a lawful business, is entitled to the same rights, and subject to the same liabilities, when not otherwise provided by law, as a private individual. This has been toó often affirmed by this court and the courts of our sister states, to be now a matter of doubt. Indeed, a corporation is but an aggregation of individuals, to whom legal unity is given, endowed with certain capacities for their own interest and advantage. It would, indeed, be singular if they were, for that reason, exempted from the liabilities for injuries to which, without their beneficial capacities, they would be subject. As stated by the Supreme Court of the United States, in Marshall v. The Baltimore and Ohio Railroad Co., 16 How. 327, “These important faculties, conferred on them by state legislation for their own convenience, can not be wielded to deprive others of acknowledged rights. It is not reasonable that those who deal with such persons should be deprived of a .valuable privilege by a syllogism, or rather sophism, which deals *subtilely with words and’ [205 names, without regard to the things or persons they are used to represent.”
We therefore treat this case the same as though the road had been owned, and the trains run, by a private individual. If, under the circumstances, such private individual would be liable, the company is liable.
We profess to administer the common law of England, in so far as its principles are not inconsistent with the genius and spirit of our own institutions, or opposed to the settled habits, customs, and policy of the people of this state, thereby rendering it inapplicable to our situation and circumstances.
It has not been adopted by express legislative enactment, but brought to the old states by our fathers, and constantly claimed as their birthright. Its introduction here by their descendants was almost a matter of course, and its terms and foundation principles have been so interwoven with our constitution and laws, so blended *206 with the remedies we afford, and so constantly enforced by our courts, that its implied recognition by the government and the people, may be fairly assumed; and if it can not be said to be in force as the common law of England, it may not inaptly be termed the common law of Ohio. To it we constantly resort, when the positive law is silent or insufficient. JBuilt up, as it has been, from the experience of ages, and constantly adapting itself to the business and relations of men in society, we seldom fail to find principles which, if carried to legitimate results, are not altogether sufficient to settle every controversy. If no precedent is found for a remedy to enforce an acknowledged right, one of its own cherished principles requires us to adapt one to the exigency, and to make good the maxim, that there is no legal right without a legal remedy.
"Whatever is not prohibited, may be lawfully done. Whatever a man possesses, that the law recognizes as property, may be used for his benefit, in a lawful manner. What it allows to one, 206] it allows to all, and secures to all the ^enjoyment. Hence, in prosecuting his own lawful business, and in the use of his own property, he must submit to the great social necessity of so using his own as not to injure others. 'While they are his legal right, this is his legal duty. They go hand in hand, and the law scrupulously respects the one, and rigorously enforces the other. It treats man as a rational and intellectual being, capable of understanding his duties to his fellow-men, and requires of him, in his intercourse with them, to exercise a constant regard for their rights. In the complicated relations of civilized society, no force can be employed, no business pursued, which is not likely to result in injury to others, unless it is controlled and directed by an intelligent will, conscientiously and carefully employed to prevent it. The law, therefore, exacts of him who puts a force in motion, that he shall skillfully and carefully control it, and with a skill and care proportioned to the power of the person he thus employs. The skill and care must be reasonable, and it is not reasonable when it does not furnish at . least ordinary security against injury to others. If he is found wanting in this, and injury ensues, he has failed to perform his duty to his fellow-man, and the right to receive and the duty to make reparation, immediately arise.
This liability, when the power which produces the injury is under the direct and immediate control of the owner, it is agreed, is sub *207 ject to no exception. It extends to every kind of business, and to every human being, in or out of his employ.
But the principle, does not stop here. What he can do for himself, he can, if his interest, convenience, or pleasure requires it, do by another. He can place the power and control of the force he employs, under the direction of his substitute. To make it safe to others, it requires the same care and skill as though he had retained it; and as it is still used for his benefit, and by his direction, he can not, in this manner, release himself from any part of the obligation he owes to others, to use it with reasonable care and skill. In *such case, it is his will that the mind of his substitute should [207 control its operations, instead of his own; and while he may lawfully make this substitution, he can not escape responsibility to those who are injured by the failure of his substitute to discharge his duty with skill and care. The rule is thus stated by Judge Story (Story on Ag. 452): “It is a general doctrine of law, that, although the principal is not ordinarily liable (for he sometimes is), in a criminal suit for the acts and misdeeds of his agent, unless, indeed, he has authorized or co-operated in those acts or misdeeds, yet he is held ' liable to third persons, in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances, or misfeasances, and omissions of duty of his agent in the course of his employment, although the principal did not authorize or justify, or participate in, or, indeed, know of, sueb misconduct, or, even if he forbade the acts, or disapproved of them. In all such cases, the rule applies respondeat superior, and it is founded upon public policy and convenience; for, in no other way, could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case, the principal holds out his agent as competent, and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct, in all matters within the scope of the agency.”
Under the operation of this doctrine, social duty and public policy combine to make the principal liable for the negligence and carelessness of his agent, in the same manner and to the same extent as though it was his own. It is his duty to make reparation for injuries arising from the careless management of forces employed for his benefit; and it is the policy of the law to make him sensible of this responsibility, that he may be the more careful in selecting his agents, and also that those who are injured may have a certain and *208, 209 responsible resource for redress. It is sometimes thought to be a hard rule, in cases where the principal himself has not been negli208] gent, or guilty of intentional wrong; *but when it is remembered that, even in such cases, some innocent person must suffer, it seems to be as manifestly just as it is clearly the law that the loss should fall upon him who has put it in the power of another to commit the injury, and for whose benefit and advantage alone the force was employed.
These being the general principles of the common law, the question arises, whether those who receive injuries, while engaged in the employment of the principal, from the negligence or carelessness of those placed over them by him, are excluded from the protection these rules were designed to afford. The verdict finds the defendant, in error without -fault. He engaged to serve the company in the capacity of brakeman, and to submit in all things to the orders and control of the conductor who' might be placed over him by the company, and put in charge of the train. While performing his duties faithfully, in accordance with his contract, he is injured by the carelessness of the conductor, to whose control he has been subjected by the company. He had no power to determine who this conductor should be, and no right to control or participate in the duties which the company had devolved upon the conductor. He had, by his contract, promised obedience; and this the company had a right to require, and they received it. Did they come under no obligations to him ? If he was bound to perform with diligence and care the orders of the company, given by their substitute, the conductor, were they not bound to govern him with a proper regard to his safety? Aside from his rights under the contract of service, he was a man, whose life and limbs were as valuable to him as though he had never entered their service; and, as . such, had he no right to require that they should perform toward him, as well as others, the great law of social duty, to so use their own as not to injure others ?
While it is conceded they would be liable to those not in their employ and under their control, can the law be less regardful of the 209] rights of. those from whom all power to provide *for their own safety is taken, and who are obliged to occupy posts of danger, whether directed with care and skill or the contrary ?
But one answer to these questions, that any man can understand, has ever been given, and it is this : that by entering the service *210 of the principal, the employe takes upon himself all the hazards arising from the carelessness and negligence of those that the employer has placed over him, in charge of the business, and by his contract releases the employer from all liability from injuries received from such causes. That this is expressed as a part of .the contract is not pretended ; but it is supposed necessarily to spring' from it, and to be enforced from considerations of public policy.
That the servant takes upon himself all the ordinary risks incident to the business, including liability to injury from the negligence of other servants employed with him by the common principal, but having no control over the business, or the servant who receives the injury, we are quite ready to admit. In such case they stand to each other as equals, and are alone liable for the injuries they inflict. But that the principal is, by anything incident to the contract of service, released from his obligation to- everybody, to superintend and control the business with care and prudence, so as to prevent injury, we think, wholly unsupported by reason, and as yet, nearly so by authority.
No one has the right to put in operation forces calculated to ' endanger life and property, without placing them under the control of a competent and ever-active superintending intelligence. Whether he undertakes it, or procures another to represent him, the obligation remains the same, and a failure to comply with it in either case, imposes the duty of making reparation for any injury that may ensue. When one enters his employment in a subordinate situation, and agrees to be subject to his orders, either directly or indirectly given, he has a right to expect that his employer will perform *the duty resting upon him, to furnish [210 suitable machinery, and control it with care and prudence. Whenever the law recognizes duties, it imposes corresponding obligations. It is the duty of the owner to superintend and control the forces he employs, and the duty of the servant to obey and perform under his directions; and, certainly, in the absence of positive stipulations, the law will not, as between themselves, throw those which belong to the one, on to the other, or refuse to enforce the obligations which either may have incurred.
As corporations can act only through their agents and officers, authorized to exercise the functions conferred by their charters, there is much force in the view of the late C. J. Hitchcock, that the superintendent (and conductor when running a train) of a *211 railroad, ought to be regarded as the proper representatives of the company, and their acts considered as those of the company. But I do not think it necessary to insist upon this position. Let the company be liable only upon the maxim respondeat superior, or upon the obligations arising out of the contract of service, and in •either view, their liability for injuries to their subordinates, caused by the carelessness of the conductor they have placed over them, in charge of the train, is in our opinion, sufficiently apparent. This conclusion rests wholly upon the idea that the company, from the very nature of the contract of service, is under obligations to them, as well as they to the company; and that among these obligations is that of superintending and controlling, with skill and care, the dangerous force employed, upon which their safety so essentially depends. For this purpose the conductor is employed, and in this, he directly represents the company. They contract for, and engage his care and skill. They commission him to exercise that dominion over the operations of the train, which essentially pertains to the prerogatives of the owner; and in its exercise he stands in the place of the owner, and is in the dis-211] charge of a duty which the owner, as a man and a *party to the contract of service, owes to those placed under him, and whose lives may depend on his fidelity. His will alone controls everything, and it is the will of the owner that his intelligence alone should be trusted for this purpose. This service is not common to him, and the hands placed under him. They have nothing to do with it. His duties and their duties are entirely separate and distinct, although both necessary to produce the result. It is his to command, and theirs to obey and execute. No service is common that does not admit a common participation; and no servants are fellow-servants, when one is placed in control over the other. The servants employed to execute can not recover for injuries arising from a failure in that part of the business committed to them, because it is their failure, and not that of their employer; and although it should happen from the negligence of but one of them, yet each one entered the common service with a knowledge that others must be engaged, and they were jointly bound to perform what was jointly intrusted to them, and public policy may be concerned in their keeping a supeiwision over each other for the purpose. But how this can be made to extend to the conductor, over whose acts they have no supervision or control, and are not pre *212 ¿¡umed to be possessed of the requisite intelligence for the purpose, we are wholly unable to* see; and equally so, 'how the safety of travelers is likely to be jeoparded by adding to the responsibility of the conductor for his carelessness, that of the company that places him in power.
But it is very confidently claimed that this view of the law is at •variance with all the adjudged cases in England and in this country — not only with the decisions of every court, but with the opinion of every judge of those courts. We are referred, in proof of this position, to the cases of Priestly v. Fowler, 3 M. & W. 1; Hutchinson v. The York N. & B. Railway, 5 Ex. 343, and Wigmore v. Jay, Ib. 354, decided by the English court of Exchequer; Murray v. The South Carolina R. R. Co., 1 McMullen, 385, by the court of appeals *of that state ; Farwell v. The Boston & Worcester [212 R. R. Co., 4 Met. 49; and Hayes v. The Western R. R. Co., 3 Cush. 270, by the Supreme Court of Massachusetts; and Coon v. The Utica and Syracuse R. R. Co., 1 Seld. 492, by the court of appeals in New York.
We entertain the highest respect for these courts, and their undivided opinions upon any question arising upon the principles of the common law, would cause us to hesitate long before we differed from them. But even upon such a question, we should be com-i< pelled to follow the dictates of our own understandings; and the more especially should we feel at perfect liberty to do so, when they did not profess to base their decisions upon any settled principle of law, but undertook to declare a now rule for their action. If such a rule did not seem to us consistent with the analogies of the law, and calculate to promote justice, we should feel bound to reject it. Upon this question, we find no occasion to depart from established principles. It lies upon those who deny the defendant in error the benefit of these principles, to show some good reason for the exclusion. We have carefully examined all these cases, and can find in none of them any such reason, or any denial of the principle upon which we base this decision. While we can not approve all that is said in some of them, no one of them has determined the question now before us. Priestly v. Fowler was decided in 1837, and is the first case to be found in the English books where the limitation of the liability of the master is even hinted at. The action was brought by a servant against his master, for the negligence of another servant in overloading a van, by which *213 the plaintiff was injured. It was held the action could not be maintained. Chief Baron Abinger, in delivering the opinion, says: “ There is no precedent for the action by a servant against a master. We are therefore to decide the question upon general principles; and in doing so we are at liberty to look at the consequences of a decision one way or the other.” He accordingly looked at the consequences, with a view to the actual state of 213] ^English society, and concluded they would carry him to an “alarming extent.” After referring to several instances where the liability of the master would attach, he concludes that “the inconvenience, not to say absurdity of these consequences,” afford a sufficient argument against the action.
It can admit of very little doubt that holding the relation of master and servant to-exist between the buyer-and seller of a coach or a harness (instances put by his lordship) would, indeed, be both inconvenient and absurd.
It is unnecessary to examine, at any length, the other cases decided in that court. Upon a similar state of facts they each follow and affirm the doctrine of Priestly v. Fowler.
As these cases were decided upon no settled principle of the common law, but upon general principles, with a view to consequences, I may be permitted to refer to the opinion of another court, equally learned and able, sitting in the same kingdom and subject to review, if I am not mistaken, in the same ultimate tribunal. In the case of Dixon v. Ranken, 1 Am. Railway Cases, 569, determined by the highest court in Scotland, as late as 1852, the doctrines of the English cases were repudiated, and an exactly contrary decision made. The lord justice clerk, after referring to the English decisions, proceeds to say: “ The master’s primary obligation in every contract of service, in which his workmen are employed in a hazardous and dangerous occupation, for his interest and profit, is to provide for and attend to the safety of the men. That is his first and leading obligation, paramount even to that of paying for their labor. This obligation includes the duty of furnishing good and sufficient machinery and apparatus, and of keeping the same in good condition, and the more rude and cheap the machinery, and the more liable on that account to cause injury, the greater his obligation to make up for its defects- by the attention necessary to pi-event such injury. In his obligation is included, as he can not do everything himself, the duty to have all acts by *214, 215 others whom he employs done properly and carefully in order to avoid risk. This obligation is not *less than the obligation [214 to provide for the safety of the lives of his servants by fit machinery. The other servants are employed by him to do acts which, of course, he can not do himself, but they are acting for him, and instead of himself, as in his hands. For their careful and cautious attention to duty, and for their want of vigilance, and for their neglect of precaution by which danger to life may be caused, he is just as much responsible as he would be for such misconduct on his own part if he were actually working or present. And this particularly holds as to the person he intrusts with the direction and control over any of his workmen, and who represents him in such a matter.'" And he adds: “ There have been many cases in Scotland, at all periods and during the last fifty years, a very large number which proceeded on- this as a fixed principle of the law as to the contract of service.”
Lord Cockburn, after stating that “the plea that the master is not liable, rests solely on the authority of two or three very recent decisions of English courts,” says : “If this be the law of England I speak of it with all due respect. But it most certainly is not the law of Scotland. I defy any industry to produce a single decision, or dictum, or institutional indication, or any trace of any authority to this effect, or of this tendency, from the whole range of our law. If such an idea exists in our system, it has, as yet, lurked undetected. It has never been condemned, because it has never been stated.” After alluding to the fact that the rule had heen pressed upon the court, not only on account of the weight of English authority, but for its own inherent justice, he proceeds : “This last recommendation fails with me, because I think the justice of the thing is exactly in the opposite direction. I have rarely come upon any principle that seems less reconcilable to legal reason. I can conceive some reasonings for exempting the employer from liability altogether, but not one for exempting him only when those who act for him injure one of themselves. It rather seems to me that these are the very persons who have the strongest claim upon him for reparation, because they incur danger on his account, and ♦certainly are not understood, by our law, to come under [215 any engagement to take these risks on themselves.”
Such is the diversity of opinion, not only as to the existence of the doctrine, but also as to its justice and propriety, found to obtain *216 in two of tbe learned courts in Great Britain; both uncontrolled by any statutory regulation, or other consideration peculiar to the system of law administered by either; but each determining the obligation arising from a relation, founded upon contract, which must be the same in England and Scotland.
The case of Murray v. The S. C. Railroad, 1 McMullen, 385, was decided in 1841. The plaintiff was a fireman, and was injured by the carelessness of the engineer. A majority of the court held that he could not recover. Judges O’Neall and Gautt, and Chancellor Johnston dissented. They admit that the plaintiff took upon himself, as a consequence of his contract, all the ordinary risks of the employment, and that he could not claim for injuries, against which the ordinary prudence of his employers could not provide; but they insist that injuries from negligence do not belong to these ordinary risks; that the company was bound to carry him safely, while he was bound to serve them faithfully; and that neither party should be permitted to extend or abridge the contract. “ That the master can not exact other services than those stipulated for; nor, by any indirection, subject the servant to any other than the ordinary perils incident to the employment; and that if he does, by any agency whatever, or by any means, whether of design or negligence, accumulate upon the servant, while in the performance of his duty, any dangers beyond those inherent in the service itself, they fall upon the latter, not as a servant (for his contract does not bind him to endure them), but as a man, and the law entitles him to redress.”
The next case in order of time is that of Farwell v. The Boston & Worcester R. R., 4 Met. 36. The plaintiff, an engineer on the 216] defendant’s road, was injured by the negligence *of a switch-tender. His right to recover against the company, was denied in a very ingenious opinion by C. J. Shaw; in which the general proposition is maintained, that a master who uses due diligence in the selection of competent servants, and furnishes them with suitable means to perform the service in which he employs them, is not liable for the carelessness of one resulting in injury to another, While both are engaged in the same service. Of judicial determinations, he was able to bring to his support only the cases of Priestly v. Fowler, and Murray v. The S. C. Railroad; and characterizing it “as in some measure a nice question,” he says: “we would add a *217 caution against any hasty conclusion as to the application of this rule to a case not fully within the same principle.”
That it was not intended, by this decision, to foreclose the question now before us, is evident from the later case of Hayes v. The Western Railroad, 3 Cush. 270, in which the negligence charged, was that of a brakeman, acting, as was claimed, pro tempore, as conductor ; and it was argued, that although the company were not liable to a laborer, for the neglect of another laborer, yet they were answerable for the neglect of an officer, such as the conductor was. The court expressly declined expressing any opinion upon the soundness of this distinction, and held that it did not properly arise upon the facts of the case.
The case of Coon v. The Syracuse and Utica R. R., 1 Seld. 492, was brought by a trackman, employed by the defendants to keep a certain portion of their road in order, who claimed to have been injured by the negligence of the managers of a train running upon the road. The court considered the case governed by the authorities to which I have referred, and especially the one from Metcalf, and gave judgment for the defendants. Judges Gardner and Foot only, expressed opinions. The former said the good sense of the principle, when applied to individuals engaged in the same service, was sufficiently obvious; but that there might be more doubt of its justice in reference to those whose employments are ^distinct, [217 although both may be necessary to the successful result of a common enterprise. And the latter admits that it “ has been UDfolded and brought to view within the last twenty years, and principally by the new business commenced within that period, and now extensively prosecuted, of transporting persons and property by steam on railways.”
I have now referred to every decision of a court of last resort, within my knowledge, bearing upon the question under consideration.
While the principle of respondeat superior is as old as the law itself, it is everywhere admitted that no such exception to its operation as is now contended for, was ever asserted until the case of Priestly v. Fowler was decided.
That case, and those made upon its authority in England and America, have all proceeded upon the general ground of exempting the master from responsibility to one servant for injuries arising from the carelessness of another engaged in the common serv *218 ice, because the servant, by his contract, takes these risks upon himself. None of them have in terms declared that he is not liable for the negligent and careless conduct of him to whom he delegates the power of control and command over them. The court whose authority has been most relied on in this country, has expressly refused to declare it. Even to this extent the doctrine has been resolutely resisted at every step by distinguished jurists. To speak of it, therefore, as a settled principle of the eommon law, is to confound ideas. To adopt it without a conviction of its justice and propriety, is to abuse the power with which the law has invested us. Our plain duty is to endeavor to ascertain the true nature of the relation between the parties, and the inherent elements of the contract on which it is founded, and from them deduce the principle that ought to govern. For, as has been said by an elegant writer: “ If law be a science, and really deserves so sublime a name, it must be founded on principle, and claim an exalted rank in the empire 218] of reason.” And upon a question like this, *what is good sense at Westminster is good sense at Edinburgh, or wherever else parties may contract.
Tested in this manner, it seems to us clear, in a case like the present, that as between the company and those employed to labor in subordinate situations under the control of a superior, two distinct classes of obligations arise — the one resting upon the company, and the other upon the servants — and both founded upon what'each, either expressly or impliedly, has agreed to do in execution of the contract. It is the duty of the company to furnish suitable machinery and apparatus, and, as they reserve the government and control of the train to themselves, and intrust no part of it to these servants, to control it and them, with prudence and care. As the necessity for this prudence and care is constant and continuing, the obligation is performed only when it is constantly exercised, and they can not rid themselves of it by devolving this power upon the conductor. If they intrust him with its exercise, in the language of Judge Story, they “ in effect warrant his fidelity and good conduct.”
It is the duty of the servants to obey'the orders of the superior thus placed over them, and to perform as he shall direct. If they fail to do this, and injure each other, they violate their engagements to the company, and are alone answerable for the wrongs they may do. In such case there is no failure of the company to do what, as *219 between them and these servants, it was understood they should do, when the servants entered the service. But they can not be made to bear losses arising from carelessness in conducting the train, over which their employer gave them no power or control, either separately or collectively, until we are prepared to say that justice and public policy require the consequences of duty omitted by one party to be visited upon the other, although stripped of all power to prevent such consequences.
While one member of the court would extend the liability further than a majority of us think the principle upon whiqh it is founded will warrant, we are all of opinion that there *was no error [21Í) in the instructions given by the court below to the jury, and that the judgment should be affirmed.
Warden, J.
While I agree that this judgment should be affirmed, the ground on which I would place the right of the plaintiff below is so much broader than that taken by the majority of the court, that in view of the construction which will be given to their ruling, and what appear to me its consequences, I feel bound to state my qualified dissent, with the reasons that appear to support it.
Having been compelled to examine this question judicially, several years ago (Stevens v. Little Miami Railroad Co., 7 W. L. Jour. 369, being the same case which came under examination in 20 Ohio, 415), I was led by its careful consideration to the undoubting conclusion that the maxim, quiper alium facit, per seipsum facere videtur, applies to cases of different servants employed by the same master, where one, by his nonfeasance or negligeuee, does an injury to the other. No decision that has since been made, nor any reasoning with which I have become acquainted, has satisfied me that in its application to facts like those now before us, the rule of liability on the part of a master for the negligence of his servant, was not then stated with substantial accuracy. And, while the respect due to learned judges in England, and in some of our sister states, as well as that I owe to my brethren in this court, commands me to express my dissent from the conclusion they have adopted with no more positiveness than results fi'om my own calm, though it maybe mistaken conviction, I shall be pardoned, I trust, for the confidence with which I state my own opinion of the true rule of law on this subject.
By the case of Priestly v. Fowler, 3 M. & W. 1, and the Amer *220, 221 ican cases which have followed it, the maxim to which I have referred is so restricted as to deny the liability of a master, in any case, for the negligence of one of his servants whereby another sustained injury. 'This court, as I understand the effect of the de220] cisión just pronounced, ^refuses so to qualify the rule, but does confine the liability of one who is the employer of several persons, for the negligence of one of his employes, whereby another is hurt, to cases in which he who was damaged was subordinate to the negligent agent or servant.
I have been unable to satisfy myself with either restriction. I think none such is made by law, or demanded by public policy.
That in England, a menial servant could not have an action against his master for the negligence of a fellow-servant, of the like state and condition with himself, does not strike me as a novel view of the law; though, so far as I know, it had never been taken before the days of Lord Abinger. The reasoning of that learned, but somewhat eccentric judge, does not, indeed, very strongly lead my mind toward any such conclusion; for his whole opinion is but one of the many instances of how little some of the most shining talents of the advocate appear to prepare their possessor for the office of the judge. But a view of the English legal and social system reveals some apparently valid reasons for denying a right of action by a domestic servant against his master for negligence, whether of the master or of another servant.' Were such an action brought in an English court, there would be vividly present to the judge all the features of that division and subdivision of the English people into classes, which has survived every shock given to the constitution, and resisted every reform attempted in the state. From the highest of the degrees of nobility and honor derived from the king as their fountain, there is a long descent through the ranks of dignity and worship, and even through the condition and esteem of tradesmen, artificers, and laborers, down to that lowest estate held by the menial servant.
Putting aside, for the present, what suggestions of policy would arise out of the intimate, familiar character of the relationship between master and servant', I should not be astonished beyond 221] measure to find that the contempt in *which the class of menial servants was anciently held, had so continued down to 1837, that even then the assertion of a claim by an individual of that class, founded on the negligence of his master, would have encoun *222 tere'd some opposition from that reverence for rank, which must have entered into the constitution of any English tribunal whatever. Descendants of the serví, the villeins, and born thralls, who led the hard life of servitude throughout the governmental changes of ancient times in England, menial servants had a very poor estimation in legal regard. Their condition is treated of by Blackstone, in immediate connection with that of slaves and villeins. They were not left to their own volition as to serving or not serving. All single men, between twelve years old and sixty, and married ones under thirty years of age, and all single women between twelve and forty, not having any visible livelihood, were compellable, by two justices, to go out to service in husbandry or certain specific trades, for the promotion of honest industry. 1 Bla. 425, 426. The contract of hiring, where no limitation was expressed, was construed with reference to a supposed duty of the master, to protect his dependents throughout the changes of the year, whether there was work to be done or not. Ibid. No master could put away his servant, or servant leave his master, after being so retained, either before, or at the end of his term, without a quarter’s warning, unless upon reasonable cause, to be allowed by a justice of the peace, although they might part by consent, or make a special bargain. Ibid. Such a servant had no clear right of action for a moderate correction by his master — in some instances, that exercise of authority was clearly lawful. The master could justify a battery in defense of his servant, and the servant the like in defense of his master. In these respects, and in the enforcement of strict obedience and outward reverence, the master almost stood in loco parentis. In a word, the menial servant was so far a member of the household, that Blackstone evidently looks upon his master as the paterfamilias even as to him. 1 Bla. 431. We begin now to appreciate the ludicrous *alarm of Lord Abinger, at what he supposes [222 to be some of the consequences of allowing a servant to sue his master for the negligence of a fellow-servant. We can discover whose interests he has in mind, and what is the source of his anxiety, when he says: “The master, for example, would be liable to the servant for the negligence of the chambermaid in putting him into a damp bed! ” etc.
But there are better reasons for denying the right of action to a domestic servant in England, against the master, for the negligence of a fellow-servant. The state of such a servant is, in general, one *223 of comparative comfort. Deeds of kindness and mercy, strong personal attachments, and a noble fidelity, have often illustrated the relationship of master and servant. Most favorably regarded, and leaving out of sight occasional cruelty and insolence, the relationship itself had strong points of resemblance to that of parent and child. The bringing of an action for negligence, by child against parent, or by the latter against the former, might not have apj>eared more unnatural than such an action by a domestic servant against his master, or vice versa; for the disability must,have been mutual.
If, then, an English court should have found, that, from time immemorial, the lips of such a servant had been sealed against all complaint of his master’s negligence, it might well have turned away from his claim for redress by his master, of a wrong resulting from the negligence of a fellow-servant. If the case of Priestly v. Fowler had been such a one, I should not have felt shocked at the judgment, whatever may be said of the reasoning in that case.
But it was no such matter. The plaintiff and his fellow were servants of the defendant, “in his trade of a butcher.” Even if the declaration had averred that they dwelt with their master, having bed and board under his roof, that, I take it, would not have made them menial servants. “ Residence intra moenia, i. e., within the curtilage or domain of the master,” says Mr. Hargrave (1 Bla. 425, note), “ constitutes gardeners, gate-keepers, and others, domes-223] tic *menial servants. But residence intra moenia, is not sufficient of itself to render every servant a domestic; thus, the clerk to an army clothier, though resident on the premises of his employer, is no domestic — nor is a warehouseman.” All that can be said, is, that consistently with the declaration in Priestly v. Fowler, the plaintiff might or might not have been a menial servant. Lord Abinger makes no distinction between the different sorts of servants.
Tot there is, and always was, such a distinction. The whole history of tradesmen and artificers} for instance, forbids us to class them with menial servants, no matter what their place in the scale of employment, at least when they ceased to be apprentices. Like common laborers, whose state indeed was often, if not generally, even more wretched than that of menial servants, they may have been held in check by the contempt with which all labor was regarded. But men employed in the workshop of the mechanic, or in like occupations, had never been so stamped with the mark of inferiority as to lose the common rights'of English subjects. And, however *224 hard the struggle they have made for a meliorated condition, I can not think that, in the year of our Lord 1837, the law of England recognized any rule of public policy as opposed to the maintenance of actions by such persons against their employers where strangers to the contract of employment, injured by the negligence of one of such employes, might have had their action. Not one of the reasons, which forbade such an action by a menial servant, has the least application to the case of such employe.
A passage in Blackstone’s Commentaries appears to have been read by the learned Chief Justice Shaw (Farwell v. Boston & Wor. R. R. Corporation), as though it countenanced the doctrine in Priestly v. Fowler. After citing and commenting on the language referred to (1 Bla. 431), the chief justice says: “ But this presupposes that the parties stand to each other in the relation of strangers, between whom there is no privity.” Surely, this is straining — unless, ^indeed, all that is here meant is that there must be no [224 privity of contract between the negligent servant and him who sues the master; or, rather, that the plaintiff must not be privy to the contract of service between the negligent servant and his master. This is certainly all that Blackstone intended when, for illustration (not as a definition), he put the case of liability on the part ' of a master to a “ stranger.” And each of several persons, serving a common employer under distinct hirings, is a stranger to the contract of each and every other workman or servant under the same master or employer.
Enough has been said to show th'at there is nothing in the objection of Lord Abinger (followed in this by C. J. Shaw), that there is no precedent of such an action as that we are considering. The failure to find such a precedent in the books of English reports, is not astonishing. It is not. improbable that the first attempt to make such a precedent was the very case before Lord Abinger. If a menial servant had brought such an action, he would probably have failed in any court. That no other employe ever ventured to make the attempt, can easily be accounted for, without denying his right. Menial servants being placed as I have shown in legal regard, other servants were subjected to some disabilities, in fact if notin law, from bearing the same name, and being, to some extent, in the same social estimation. They would not be very apt to stand _ on their strict rights, or very able to enforce a favorable hearing — to say nothing *225 of the expensiveness of the legal luxury of an action in an English court.
We have, then, no good authority for holding the law to have been such as Lord Abinger declared it, unless his decision, and those which have treated it as a leading case, furnish that authority. This would date the doctrine as of the year 1837.
But we have, I think, good authority for denying that such is, or ever was, the law of Scotland — and the ancient laws of England 225] and Scotland were very like, in all matters of this *sort. My learned brother who delivers the majority opinion in this case, has cited the evidence that the Scoth rule is such as I have supposed.
The notion of Chief Justice Shaw that the contract of service includes an undertaking by the servant of all risks, whether of unavoidable accident or of damages arising from the negligence of other servants, is certainly an ingenious invention to fortify the case of Priestly v. Fowler. But the rate of compensation in dangerous employments, and the well-known motives of inclination or necessity which cause men to undertake them, are against such a supposition. No such agreement or understanding is ever had, or ought ever to be countenanced by the law. It would be so against reason and conscience as to be void.
Nor is the notion that to discountenance actions like these will lead to a watchfulness by every servant over the conduct of his fellows entitled to any higher regard. In the instance of an equal, such watchfulness would be fruitless unless it were accompanied by tale-bearing; and what an equal would disdain to do, an inferior would' not dare to attempt — while no officer in command would submit to such conduct in an inferior. There would be an end of all confidence and all subordination alike.
If, then, in the language of Lord Abinger, we are at liberty to look at the consequences of a decision the one way or the other, I can not imagine any ill consequence of holding that where an action is brought against the employer for the negligence of one in his employ, the mere fact that the plaintiff was also in his employment, whether as an equal, a superior, or a subordinate, is not to turn him out of court.
Whether the distinction I have shown to exist in England between menial and other servants, ought to be taken in this country, it is unnecessary, perhaps, to inquire. It is certain that it can not here be made by any fixed legal rule of respect or degradation. It *226, 227 may be, however, that the same intimate, familiar relationship of master and servant here, as in England, forbids the action for negligence either way, as ^between members of the same house- [226 hold. There may be no political reason or social necessity for departing from what would be a good rule in England on this subject.
And it ought to be admitted that since there are some employments in which large and uncontrollable masses of men engage, and for which no particular or careful selection can be made, the rule of the employer’s liability for the negligence of those under him ought to be carefully confined to casos strictly within its reason. Nor ought light and trivial causes to find any countenance.
But, leaving room for the ascertainment of all necessary exceptions, I would certainly hold the employer to his common liability for the negligence of one into whose hands he has put the power of doing hurt, as well when the plaintiff was also in his employment as when the wrong was done to a stranger, and wholly without reference to the superiority, the equality, or the inferiority of the plaintiff, relatively to the negligent employe. I would not except the case of a conductor (for instance), because he happened to be in command. He is no more the representative or organ — in other words, the agent — of the railroad company than the brakeman, or any other subordinate. The conductor is an agent appointed to command; the brakeman is appointed to obey; but commandment and obedience are alike acts of agency. The fact of superiority or subordination in the position of the agents can, in my opinion, be important only in a case which shows the inferior to have sustained the hurt through his obedience to some order of the superior. But where the hurt is not a necessary consequence of the subordination, and is not otherwise connected with it than by the necessary presence of the inferior in his place, I see no peculiar warrant of recovery in the fact that the person negligent was in a place of command. I look upon every officer of the railroad company, no matter how high in trust, or low in responsibility, as its agent and nothing but its agent. None of them is the corporation ; all of them are its representatives for some purpose, and to some ^extent. The conductor of a railroad, for instance, '[227 does not select his subordinates. He does not, in fact, agree to stand all the risks of their negligence; he merely agrees to be faithful himself in holding them to their respective duties. If he be faithful — if no negligence of his peculiar duty can be imputed to *228 him — I can find something much better than a precedent of an action by him against the company for the negligence of one under him in employment.
I find to support such a claim the broad and equitable principle — ■ what a man does or neglects by another, he does or neglects himself. Qui per alium facit, per seipsum facere videtur, is a maxim of justice and- humanity as well as law. It is as well founded in natural right as any other rule growing out of the social condition. It is no more the result of convenience than property itself. What we call public policy, may artificially extend or limit its application, according to times, places, and conditions; but almost every conceivable right or duty of social relation may be circumscribed in like manner and for like .ends, the great right of property itself forming no exception to this truth. The right of one hurt to be made whole by him who caused the injury, whether through a merely mechanical means, or through a living, intelligent agency, which he set in motion, is as nearly absolute as any that distinctively belongs to a state of society.
In refusing to admit the exceptions to the operation of this rule, ■•which certain courts have declared to exist, I am governed not a ¡little by the notice I have taken of the difficulties and embarrass¡naents into which the most learned and humane jurists have always fallen, in announcing this new canon of the law of agency.
The rule of law which protects the agent against an action by a •stranger for mere negligence, want of skill, or nonfeasance (see1 Story on Agency, sec. 308), is not merely overlooked by the distinguished chief justice who established the precedent of the new .rule in Massachusetts; but it is plainly intimated by the learned judge that the action should have been against the negligent agent. 228] This instance, and *that already given of the strained construction given by the chief justice to the words of Blackstone, ,-show that the invention by Lord Abinger of all manner of forced (illustrations to justify his decision, is not altogether inexplicable. To stand on the old law was easy; to make a new one was attended with the greatest trouble, and required the most artificial distinctions.
• ,,In the ruling of this court I also find, or imagine, several matters, which render it difficult to recognize the reason of the decision here ¡•made.
I can not see how this action would be helped, if we could con *229 sider the conductor as the visible representative or embodiment of the corporation itself. Every suggestion of policy forbidding the liability of án employer to one of his employes, for the negligence of another, is equally good against an action by such employe for the damages he may sustain through the negligence of the employer himself, if he undertake to do the duty of a conductor, a foreman, or the like. Just as large a risk ought to be taken in the one case as in the other. If the employer himself is a fit person for the work he undertakes, he can as well defend himself against an action for a particular instance of negligence on his own part, as' against the like action for the particular negligence of one of his servants, whom he has selected on account of his general fidelity and fitness. If I am right in this — and I believe it will be found that I am — the observation of Judge Story, on the cases which have discountenanced such an action as the present, deserves more attention than it has generally received. He states the new doctrine so as clearly to imply a doubt of its soundness, and remarks: “ In neither of these cases could there be the least doubt that the principal would have been liable, if the injury had been occasioned by his own personal negligence or omission of duty.” Story on Agency, sec. 453c.
In any view I can take of this question, the right of the plaintiff must be as broad as I have stated. I disagree to the restriction of that right, because I believe that there can *be found to war- [229 rant such limitation, no rule of law, no maxim of any system of jurisprudence whatever, and no consideration of public policy. I think it is a novelty in the law, resting on a doubtful foundation of justice, and making a discord in the system into which it has been forced. On the other hand, a wise and salutary maxim seems; to establish the right as I believe it to exist. And if that right has not been pronounced by the ancient oracles of the law, the common' sense and common humanity of such as tempt men into hazardous employments, constantly recognize the answering duty, and establish precedents of its obligation none the less valuable because they do not enter into the books of reports.